McRAE v. SLEEPER.

1. FRAUDULENT CONVEYANCES—INTENT—QUESTION OF FACT—EVIDENCE.

In proceedings by complainants to set aside an attachment levy on lands sold to them by the judgment debtor, which defendants claimed was made in fraud of creditors, where the fraudulent intent is made a question of fact by the statute (3 Comp. Laws, § 9536, 4 How. Stat. [2d Ed.] § 11420), and the conclusion of the circuit judge that such sale was in fact fraudulent is supported by the evidence, his finding will be affirmed.

2. SAME—EQUITY—ACTUAL CONSIDERATION.

Complainants' contention that they ought to be protected by the decree to the extent of the consideration actually paid cannot be sustained where the record shows that only part of the lands conveyed is subject to the levy, and the rest is ample security for the consideration actually paid.

Appeal from Montmorency; Emerick, J. Submitted June 25, 1915. (Docket No. 71.) Decided September 28, 1915.

Bill by George F. McRae and another against Albert E. Sleeper and others for the purpose of setting aside an execution levy on certain lands. From a decree for defendants, complainants appeal. Affirmed.

*Joseph H. Cobb,* for complainants.

*Elmer G. Smith,* for defendants.

Creditors of one Edward D. Pendock, defendants and cross-complainants in this action, attached certain lands. Complainants, claiming to be purchasers of some of the lands attached, filed their bill of complaint for the purpose of setting aside the attachment levy. In their answer and cross-bill defendants ask to have complainants' deed set aside as fraudulent as to creditors of Pendock. Applicable statutes are 3 Comp. Laws, §§ 9533, 9536, 9537, being 4 How. Stat. (2d Ed.) §§ 11417, 11420, 11421. A statement of the facts is given in the opinion of the circuit judge, pursuant to which a decree was entered dismissing the bill and granting defendants relief. It is claimed by complainants, appellants, that the facts should have been found otherwise, that in any event complainants should have a lien for the cash they actually paid to Pendock and for a demand owed by Pendock to complainant Kendricks, which it is claimed was released and was a part of the consideration paid by complainants for the lands. The opinion referred to is here set out:

"In the month of March, 1913, Edward D. Pendock who then lived in the village of Atlanta, in Montmorency county, was the owner of about 2,000 acres of land in that county and some 20 village lots in said village. These lands and village lots were all the property possessed by Pendock, produced no income, and

for some time he had been compelled to borrow money to pay the taxes thereon. The time to redeem from tax sales of some of the lands would soon expire, and for a man of his means he was heavily in debt. He was land poor. Under these conditions, and on March 22, 1913, he applied to complainants to purchase his lands.

"The complainants resided at Alpena, where Mr. McRae kept a retail furniture store. He was also a partner with Mr. Kendricks in the sewing machine, piano, organ, and some land business. Mr. Kendricks had been engaged in the sewing machine and musical instrument business for many years, and in carrying on the same he had traveled extensively through Montmorency county, was well acquainted generally with lands therein, and had known Mr. Pendock well since the year 1905, and had had business dealings with him since 1906. Mr. McRae did not know Mr. Pendock, nor anything in regard to his lands. He testified:

" 'I acted entirely on Mr. Kendricks' word. My partner, Mr. Kendricks, I took his word for it. He said the timber was all on the land, and the land was worth from $15,000 to $18,000. At first Mr. Pendock asked $20,000, but in a week he dropped to $10,000 for the land, and agreed to throw the 20 village lots in Atlanta in as a "bonus." '

"This proposition was accepted by complainants, and on Saturday, March 29, 1913, two quitclaim deeds were executed by Mr. Pendock, covering all of his lands and the village lots, each upon the express consideration of $1, and delivered to complainants.

"Complainants claim to have paid $10,000 for this land and these lots, as follows: They gave their two notes for $8,000. One of these notes, for $5,000, was made payable in five years, and one for $3,000, was made payable in three years, both from date. The $2,000 remaining of the purchase price they account for in this manner: There was one mortgage of $525 and another of $300 upon the land, which complainants testify they 'assumed'; but it turned out upon further examination that they had in no manner assumed the payment of these mortgages, but had simply taken the land subject to the same, and it was further developed at the hearing herein that, at the time of the

purchase, only $49 remained unpaid upon the $300 mortgage. They claim that Mr. Pendock owed Mr. Kendricks a note of $850, which was surrendered to him; also that they indorsed Mr. Pendock's note for $100, which they used in the redemption from tax sales of the lands, and gave him $225 in cash.

"Mr. Kendricks reached Atlanta on Monday, March 31, 1913, about 5 o'clock in the afternoon, with complainant's two deeds, but on presenting the same for record to the register of deeds a mistake in the name of one of the grantees was discovered, so that the deeds were not in fact recorded until April 7, 1913. In the meantime, and on March 31st, a writ of attachment in the suit of McClenathan, administrator of the estate of Charles Powell, against Pendock, had been sued out of the circuit court for the county of Montmorency, and on April 1, 1913, duly levied upon a portion of the lands deeded by Pendock to complainants. And on April 2, 1913, writs of attachment in the several suits wherein Sleeper, McNair & Elliott, the Gaylord State Savings Bank, and the Lewiston Bank were respectively plaintiffs, and Pendock was defendant, in the same court, were issued, and on the same day levied upon the lands mentioned.

"At the October term of court, these suits proceeded to judgment in favor of the respective plaintiffs for the following sums: Estate of Charles Powell, $551; Sleeper, McNair & Elliott, $550; the Gaylord State Savings Bank, $350; and the Lewiston Bank, $250. Soon after these several writs of attachment were levied and filed of record in the registry of deeds, and before such judgments had been obtained in the suits at law, complainants filed their present bill against the plaintiffs in said attachment suits to quiet their title as against the lien created by such levy and filing under the provisions of section 10564, 3 Comp. Laws (section 13365, 5 How. Stat. [2d Ed.]). The defendants answered said bill of complaint and claimed that said lands had been so transferred by Mr. Pendock to complainants with the intent to hinder, delay, and defraud his creditors, within the knowledge of complainants at the time of such transfer.

"The question, therefore, involved for ultimate determination in this case is: Was the conveyance of

the lands in question by Mr. Pendock void within the meaning and the terms of section 9533, 3 Comp. Laws (4 How. Stat. [2d Ed.] § 11417). It is not at all necessary, in order to render a conveyance void as against existing creditors of the vendor, that actual fraud should be intended, or that the vendor should intend entirely to defeat his creditors in the collection of their claims. A purpose to hinder and delay creditors is fraudulent, although the debtor may honestly intend that all his debts shall ultimately be paid. And even if a sale is made for full value, it will be void as to existing creditors, if made by the vendor with intent to hinder or delay such creditors, and the buyer has notice of such intent, or knowledge that his purchase will enable the debtor to convert his means into such shape as will prevent the creditors from reaching them.

" 'Sales on long time, or in exchange for assets not readily convertible, and not subject to levy,  *  *  *  may come within the mischief of the law.' *Jordan* v. *White*, 38 Mich. 253, 256.

" 'Knowledge by a purchaser of facts sufficient to put an ordinarily prudent man on inquiry (where the sale is attacked as fraudulent as to creditors) is all that is required, and *participation* in the fraud is not necessary.' *Eureka Iron, etc., Works* v. *Bresnahan*, 66 Mich. 489, 491 (33 N. W. 834).

" 'A fraudulent intent on the part of Pier & Wagley [vendors] and *notice or knowledge of such intent on the part of Hough & Wagley* [vendees], is sufficient to avoid the sale, without any proof whatever of actual fraudulent intent on the part of these latter parties.' And 'knowledge of facts sufficient to put an ordinarily prudent man on inquiry is all that is required.' *Hough* v. *Dickinson*, 58 Mich. 89, 94 (24 N. W. 809).

" 'It is enough that the purchaser knows what would put a prudent man on inquiry as to the motive of the sale.' *Bedford* v. *Penny*, 58 Mich. 424, 428 (25 N. W. 381).

"Such is the settled and well-known law of the State. I have no doubt that Mr. Kendricks knew that Pendock, in making the deeds, fully intended to hinder and delay his creditors in the collection of their debts, and that such must be the necessary and inevitable consequence of the conveyances made upon such an unusual consideration as that asserted in this case. He was an intimate of Pendock for years around

Powell's Hotel, where Pendock had lived until he owed $500 for board, and Kendricks knew he was disputing with Powell the amount of this bill and could not pay it. He was associated in some business dealings with him for a series of years, and until, as he says, Pendock owed him $850, loaned in small sums, which he could not pay.

"Mr. Kendricks testified:

" 'I have known Mr. Pendock ever since along about 1905. He was living at Charles Powell's when I first got acquainted with him. Indirectly, I have had some money invested that Pendock has handled, small quantities, nothing more than through letting him have some money to handle—to use. About a week before we bought, Mr. Pendock first spoke to me about it. I made no investigation about the timber, except what I took for granted, knowing Pendock as long as I had.

" 'Q. Did you have any knowledge at this time of Mr. Pendock's indebtedness to people?

" 'A. Why, yes; I had some idea that he owed some people; but as to what amount, or to who, I didn't. Pendock told me that he owed the Powell estate some money, but not near what they claimed, and he told me that he had a few other debts; but I knew nothing of the amounts. * * * I won't be positive whether he said he owed the bank in Hillman a little, or the bank in Atlanta a little, or whether he didn't. I don't pay much attention to those things; but he told me he owed a little money. Pendock has had money of me in small amounts since 1906 at different times. The first money I gave him in 1906 over here at Powell's to buy a piece of land that he wanted to buy; at that time Powell and I was doing business together as usual up to the time of his death. Pendock and I settled up, and I took the $850 note for the account. The note was dated in 1909.'

"Mr. Elliott testified that, in a conversation which he had with Mr. Kendricks on April 1st, 'he told me he was aware of the fact that we had a claim against Pendock. He said that Pendock told him he owed us $500, he owed the Lewiston Bank $350, and that Powell had a claim against him of $500, but he didn't owe him near that much, and the Bank of Gaylord, also, had a claim.' And I believe this statement of Mr. Elliott. I have no doubt that Mr. Kendricks knew far

more of the actual financial condition of Pendock than he is willing to or does admit. I believe he knew all about it, and surely he knew enough to have put any prudent, honest man upon inquiry, which is all the law requires.

"And Mr. McRae is affected with and held to the knowledge possessed by Kendricks in making this purchase. They both swear they were partners in this transaction, as well as in their general business of selling sewing machines and musical instruments, and dealing in lands, and no doubt such was the fact. And he knew, as he testified, that Pendock was making a 'sacrifice'; that he was selling his land for one-half its value, nominally, but actually for much less. Every fact and circumstance concerning the making of the sale by Pendock to complainants go to show a deliberate and desperate intent upon the part of Pendock to hinder, delay, and defraud his creditors, and, as well, knowledge of such intent by complainants. They knew his necessities, and his poverty so far as funds were concerned.

"He first asked $20,000 for lands which they fully believed to be worth $15,000 to $18,000. In a week he dropped to $10,000 for the lands alone, and gave the 20 village lots as a 'bonus.' For $8,000 of the consideration he accepted a note signed by complainants for $5,000, payable in five years, and another note for $3,000, due in three years. He took no mortgage or other security. He had pressing debts at the time and complainants knew it. By this transaction, 88 per cent. and more of his assets, besides the village lots, was absolutely destroyed so far as his creditors were concerned. And then Pendock disappeared and has not been heard from since. Mr. Kendricks is scarcely collectible for any amount, and Mr. McRae is a man of very limited means.

"These notes of complainants, in my opinion, could not be sold in the city of Alpena on ample notice for $500. The sale of such an amount of land upon such a long credit, without taking back a mortgage or other security, is an unheard-of and unprecedented transaction in this region. I never knew of one such before. It is an asserted sale, which, as against creditors, ought not to be permitted to stand, either at law or in equity.

" 'There are circumstances so frequently attending conveyances and transfers intended to hinder, delay, and defraud creditors that they are denominated badges of fraud. These badges of fraud do not in themselves, or *per se*, constitute. fraud, but are rather signs or *indicia* from which its existence may be properly inferred as matter of evidence. They are more or less strong or weak, according to their nature and the number concurring in the same case. They are as infinite in number and form as are the resources and versatility of human artifice.' 20 Cyc. pp. 439, 440.

"The well-known writer of the article of Fraudulent Conveyances then proceeds to state many 'particular badges,' and among others:

" '6. Sales on Credit.—The mere fact that a sale is made upon credit does not require that the transaction should be declared invalid; but a sale upon credit of part of his property by an insolvent debtor is a circumstance which may be considered, with others, as bearing upon the question of fraudulent intent; and an unusual length of credit is a badge of fraud. So, too, the giving of long time credit to an irresponsible purchaser without security has been considered to be a badge of fraud.

" '7. Insolvency or Indebtedness of Debtor.—Evidence of large indebtedness, or of complete insolvency, is an important element in marshaling badges of fraud to overturn fraudulent transfers; but mere indebtedness of the grantor at the time of making a conveyance is not generally of itself such evidence of fraud as will avoid a conveyance, although it is voluntary.

" '8. Transfer of All the Debtor's Property.—The transfer of all or nearly all of his property by a debtor, especially when he is insolvent or greatly embarrassed financially, is a badge of fraud.' 20 Cyc. pp. 448, 449.

"If the $850 note were an actual, honest indebtedness from Pendock to Kendricks, it should be protected in any decree which may be settled herein, unless the complainants had knowledge of Pendock's fraudulent intention, or grounds for reasonable suspicion, which, in this case, I hold that they had.

" 'If a creditor purchases more than enough property to pay his debt, although he pays a consideration for the remainder, the sale will not be upheld, unless it was made under such circumstances as would validate it if made to any other purchaser; that is, unless he has no knowledge of the seller's fraudulent

intention, nor grounds for reasonable suspicion. If the sale is for an amount in excess of the debt, with the purpose on the part of the debtor to place the excess beyond the reach of other creditors, it is void, if the creditor knew of that purpose, or intended to aid the seller in secreting a part of his property from his creditors.' 20 Cyc. pp. 478, 479.

See, also, *Gumberg* v. *Truesch,* 110 Mich. 451, 453, 454 (68 N. W. 236) ; *Scandinavian Society* v. *Lindquist,* 133 Mich. 91 (94 N. W. 592).

"My conclusion is the bill should be dismissed and a decree settled accordingly."

To the facts thus stated should be added that none of the lands attached were appraised as high as $5 an acre. No proof was introduced by defendants concerning the value of the property, and there is no testimony upon the subject, except the value of them claimed by Pendock, the sum complainants claimed to have paid, or agreed to pay, for them, and the appraisal. The value of property owned by Pendock, other than that conveyed to complainants, does not affirmatively appear.

Certain statements of fact found in the opinion are challenged as not supported by testimony. They are:

"These lands and village lots were all the property possessed by Pendock, produced no income, and for some time he had been compelled to borrow money to pay the taxes thereon. The time to redeem from tax sales of some of the lands would soon expire, and for a man of his means he was heavily in debt. He was land poor."

"These notes of complainants, in my opinion, could not be sold in the city of Alpena on ample notice for $500. The sale of such an amount of land, upon such a long credit, without taking back a mortgage or other security, is an unheard-of and unprecedented transaction in this region. I never knew of one such before."

Defendants levied the attachment upon five parcels of land not conveyed by Pendock to complainants.

OSTRANDER, J. (*after stating the facts*). The question of fraudulent intent is made by the statute a question of fact, and not of law. Assuming that the commercial desirability or discount value of the notes given by complainants is not made to appear, and that there is no evidence of inadequacy of the price complainants agreed to pay for the lands, and dismissing these considerations as in any manner controlling decision, I am impressed, after a careful reading of the testimony, that it and the natural and necessary inferences which are to be drawn from it support the conclusion of the trial court. It may be truthfully said that the opinion delivered does not state some facts which counsel for complainants thinks qualify and make less bald and positive some of the findings. But it was for the court to draw inferences from the testimony, and I think he did not err in drawing the final and conclusive one that the transaction between complainants and Pendock was not *bona fide*.

As to complainants' contention that they ought to be protected by the decree to the extent of the consideration they actually paid, it may be answered by saying that their deed conveys to them the Pendock title to lands not levied upon by defendants. It is only as to the defendant creditors that the conveyance is held to be bad. I find nothing in the record affording the information that complainants are not amply secured for the consideration actually paid by them.

The decree is affirmed.

BROOKE, C. J., and KUHN, STONE, BIRD, MOORE, and STEERE, JJ., concurred.

The late Justice MCALVAY took no part in this decision.